*Worrell & Hodge, Eldridge H. Henning, Jr.,* for respondent.

KEVORK MIKAELIAN *vs.* NAZLE MIKAELIAN *et al.*

JULY 17, 1957.

PRESENT: Flynn, C. J., Condon, Roberts, Andrews and Paolino, JJ.

CONDON, J. This is a bill in equity for the partition of certain real estate owned by Mary Mekealian, alias Mariam Mikaelian, late of the city of Providence, deceased intestate. The case was heard in the superior court on bill, answer and proof and is now here on the complainant's appeal from a decree of that court denying and dismissing the bill.

The complainant claims that the deceased was his mother and that in 1923 when she came to the United States she left him in the care of a family named Bouloudian in the city of Aleppo, Syria. The respondents claim that Mariam Mikaelian died without issue. They deny the truth of complainant's claim and assert that she had no son, but had a daughter Nazle who died at a very early age in Armenia. They further claim that the deceased had only one son

named Garabed who was born in Providence and died in infancy.

Those conflicting claims raised the main issue which the trial justice had to decide. After hearing the parties and their witnesses testify concerning their knowledge of the decedent's family history and after considering numerous exhibits, he made certain findings of fact which may be summarized as follows. The complainant is not the deceased's son. She had a daughter Nazle who died at a tender age without issue. Mariam Mikaelian left no issue surviving her and therefore the title to the real estate in question is in her next of kin and complainant is not included therein. On the basis of such findings he ordered the entry of a decree denying and dismissing the bill.

The complainant has filed twenty-four reasons in support of his appeal from said decree, but he has briefed and argued only twelve. Those neither briefed nor argued are deemed to be waived. *DiStefano* v. *Hughes,* 77 R. I. 511. Under the reasons which he has briefed, complainant makes two points. He contends first, that the trial justice committed prejudicial error in eleven rulings on the admissibility of evidence, and secondly, that the evidence does not sustain the findings of fact upon which he based his decision.

Before we discuss those contentions it may be well to summarize some of the evidence to show how the controversy between the parties arose. The real estate in question was purchased by Krikor and Mariam Mikaelian, husband and wife, and was deeded to them as joint tenants. They were married and lived together in Palou, Isabeck, a city in Turkish Armenia, until 1913 when Krikor emigrated to the United States. In 1924 Mariam joined him in Providence. It is undisputed that they had a daughter Nazle who died in Palou, Isabeck, at the age of 2 or 2½ years. It is also undisputed that they had a son born to them in Providence who was named Garabed and who died in infancy.

The locality where they lived in Providence was to a considerable degree a community of Armenian immigrants. The Mikaelians were well known there. It does not appear from the evidence that any of their friends and neighbors, some of whom testified, ever heard them speak of having a son living in Syria or France. They lived together in the same locality until November 28, 1946 when Krikor died. Mrs. Mikaelian caused his obituary to be published in "Hairenik," an Armenian newspaper published in Boston, Massachusetts, and there was no mention therein of his leaving a son surviving him. A few years later Mrs. Mikaelian died intestate on November 19, 1952. Thereafter complainant, who was living in France, learned of her decease from a friend Mary Kojabashian, a resident of Providence, who also informed him that Mariam Mikaelian had left some property. Thereupon he came to Providence, made some inquiries among people who had known the Mikaelians, consulted counsel, and finally filed the instant bill of complaint on September 17, 1953.

He testified that he was born in Palou, Isabeck, on May 18, 1910, that his father and mother were Krikor and Mariam Mikaelian, and that he was baptized Kevork. He further testified that after his father left for the United States his mother took him to Aleppo, Syria, where they lived together until 1924. In that year his mother went to Marseilles, France, to take passage from there to the United States and she left him in the care of a family by the name of Bouloudian.

He further testified that two or two and one-half years later the Bouloudians left Aleppo for Marseilles and he went with them under the name of Nichan Bouloudian. Thereafter he continued to use that name in France and was drafted into the French army thereunder. He was married under that name on September 22, 1934. He had five children and all of them were registered as Bouloudians.

When the second world war commenced he served in the

French army as Nichan Bouloudian and was taken prisoner
by the Germans on June 19, 1940. He claimed that dur-
ing his service in the army he was trying to change his
name back to Kevork Mikaelian. He said he filled out
an application while he was in the army but it was lost.
He filled out another one in 1939 but then he was cap-
tured. When he was released he was told that he must be-
come a French citizen before the application could be
acted on. In 1946 he became such a citizen but he did not
have his application for change of name processed until
1952. Incidentally that was the year Mariam Mikaelian
died.

He claimed that he corresponded with Krikor Mikaelian
until 1933. He testified that in that year Krikor stopped
writing after complainant informed him he was going to
get married and that Krikor was displeased because he
wanted complainant to come to the United States. He
testified that he also received letters from Mariam Mikael-
ian which were written for her by someone else since she
could not write. None of those letters was produced at the
trial.

The complainant, however, introduced in evidence as an
exhibit a photograph of Krikor which he testified he had
received from his alleged father in 1946 after he, complain-
ant, came home from the war. On the cover of this photo-
graph was some handwriting in the Armenian language
which complainant testified was his father's handwriting.
The inscription was translated as follows: "Mr. Krikor
Mikaelian keep as a gift Mr. Krikor Mikaelian." Later on
cross-examination the witness said it was: "Mr. Krikor
Mikaelian, Keep as a memory, to Mr. Kevork Mikaelian."
He admitted that the inscription contained no reference to
any father and son relationship between Krikor and the
Kevork Mikaelian to whom the photograph was sent.

At the time the case was tried in the superior court com-
plainant's friend, Mary Kojabashian, was living in Prov-

idence but he did not call her as a witness. Members of the Bouloudian family were living in France at that time; yet he did not take their depositions. At one point in his cross-examination he indicated that they wanted a share of the estate and that he rejected the suggestion. The complainant relied for corroboration of his story upon the testimony of three Armenian women who knew Mrs. Mikaelian and claimed knowledge of the birth of complainant in Armenia. He also relied on numerous documents which he had brought with him from France. Some of them were admitted in evidence as exhibits but several others were excluded over complainant's objection. Those objections and others to the admission of certain papers and evidence offered by respondents form the bases of his first eleven reasons of appeal. Such reasons are included among a larger number entitled 5-A to 5-T inclusive.

We shall not treat each of the eleven reasons separately since for the most part they are clearly without merit. However, a number of them do merit some discussion. Reason 5-F relates to a question addressed to complainant in cross-examination concerning the obituary in the Armenian newspaper "Hairenik." The complainant had testified that he had read it and that there was something wrong about it. He was then asked: "What was wrong about it? What did you think was wrong about it?" Objection was made on the grounds that the question was argumentative and was based on an immaterial point. Aside from the fact that the scope of cross-examination is very largely in the control of the trial justice, *Morrison* v. *Bitting,* 60 R. I. 325, and *Woodward* v. *Wilbur,* 54 R. I. 60, and subject to review only for abuse of discretion, *York* v. *Ventilato,* 80 R. I. 192, we are unable to see anything prejudicial in the question. It does not appear to be argumentative and it has some materiality with reference to the accuracy of the obituary which complainant testified he had read and that it was not written right.

Reasons 5-G and 5-H relate to four questions also addressed to complainant in cross-examination with reference to the contents of the obituary. Over his objection he was asked through an interpreter the following questions to which he gave these answers: "Q. That obituary notice purports to have the names of the next of kin of Mr. Krikor Mikaelian, isn't that so? * * * A. Yes. * * * Q. Is your name in there? A. Yes my name is in there. * * * Q. What does that obituary notice call you? A. Kevork Mikaelian. I forget. Q. Read it? A. I cannot read good. He wants me to read it? Q. * * * Well, I will have to point it out to you. Just where my thumb is, see that word there, what does it say? A. It says, 'cousin,' that is wrong. Q. It says 'cousins.' Have him read what it says? A. Cousins, Kevork and Mardig in France."

The complainant's objection to the admissibility of such questions is that they are based upon hearsay statements in a paid advertisement in a newspaper. In the circumstances we think the objection was properly overruled. Ordinarily cross-examination with reference to the contents of a newspaper with which the witness had nothing to do ought not to be allowed except with great caution and only if the inquiry has at least some appearance of relevancy or materiality to the substance of the witness's examination in chief. But here the witness had already voluntarily testified in cross-examination that he had read about his "father's" death in the newspaper "Hairenik." In view of the issue involved in his claim that he was the son of Krikor Mikaelian, we cannot say it was an abuse of discretion for the trial justice to allow the witness to be interrogated further as to what he read about his "father" in "Hairenik."

Reasons 5-J and 5-K are so clearly lacking in merit that they require no discussion. Reason 5-M relates to the admission, over complainant's objection, of respondents' exhibit E which is a clipping from the newspaper "Hairenik" of the obituary above referred to. The ground of complain-

ant's objection is that a newspaper clipping is pure hearsay and as such is clearly inadmissible. The respondents offered this clipping in the course of the examination in chief of their witness, Harry H. Avakain. He was the funeral director retained by Mrs. Mikaelian to conduct the funeral of her husband and to take care of all matters incidental thereto. He testified that in the course of his duties he prepared the obituary notice at her request and that she gave him the information concerning her husband's next of kin. He also testified that he arranged to have the obituary published in "Hairenik" and that he saw the notice in the paper. He was then shown the clipping in question and asked if the information contained therein was what he received from Mrs. Mikaelian and sent to the newspaper for publication, and he answered in the affirmative.

In the circumstances we think the admission of the clipping was proper. Its only purpose was to corroborate what the witness had already testified. In any event if it could be deemed technically inadmissible we do not see how it could have prejudiced complainant in the mind of the fact finder, who in this instance was the trial justice. He had already heard from the witness Avakain, without objection, all the information that the clipping contained. Hence the mere admission of it as an exhibit could not, in our opinion, have had any probative force or effect on his mind.

Reasons 5-N and 5-O relate to the admission in evidence of a photograph of complainant and to certain testimony concerning an inscription in handwriting in the Armenian language on the reverse side. This photograph was found among the effects of Krikor Mikaelian and had apparently been sent to him from Syria. It is the picture of complainant as a young boy. After it had been marked for identification it was shown to complainant and he admitted it was his picture but on cross-examination denied that the handwriting on it was his. Later respondents offered it as an exhibit when they were presenting their evidence. A

witness versed in the Armenian language was then asked, over complainant's objection, to translate the inscription. It developed from the translation that the picture came from Kevork Mikaelian and that it was addressed to Krikor Mikaelian as "my dear cousin."

There was no harm in admitting the photograph as an exhibit since it was merely the portrait of a young boy which complainant readily admitted was his portrait. The real difficulty comes in determining whether or not it was error to allow the inscription to be translated. As long as it remained untranslated it was harmless. If the inscription had been written in English there can be no doubt that before the photograph could be admitted in evidence as an exhibit the handwriting would have to be identified or else concealed so that only the picture itself and not the message inscribed on it could be considered as evidence. Hence, the photograph having been admitted, the witness should not have been allowed to translate the inscription without prior identification of the handwriting as that of complainant. *Kinney* v. *Flynn*, 2 R. I. 319, and see *Lancaster* v. *Marshall*, 69 R. I. 422.

If there were no other evidence tending to establish that complainant was not the son of Krikor Mikaelian and the case was being tried to a jury, we are of the opinion that such error would have been prejudicial. In the circumstances here, however, we do not think that it could have had that effect. While the trial justice refers to it several times in his decision, we assume that even if the translation had been excluded it would not have altered his conclusion that complainant was not the son of Krikor and Mariam Mikaelian. There is other evidence in the record that justifies such an assumption.

Reason 5-P relates to the admission of certain testimony given in translation of an inscription on a photograph which had been offered by respondents and marked for identification but not admitted as an exhibit. The person who wrote

the inscription was not identified. In the absence of such identification no testimony in translation of the inscription should have been allowed. However, we are not prepared to say that such inadmissible testimony was of so important a nature as to justify us in holding that the admission of it was prejudicial error strong enough to vitiate the trial.

Reason 5-Q relates to the admission of the English translation by a witness of two letters written in Armenian which were marked for identification. The letters were never admitted as exhibits. We agree with complainant that it was error to allow this translation to be spread upon the record through testimony, but for the same reasons as we have just expressed above we do not agree that such error was prejudicial.

Reason 5-T relates to the admission in evidence of respondents' exhibit C. This was a letter written in Armenian and signed "Kevork Mikaelian." When he was shown the letter in cross-examination complainant at first admitted he wrote it and that the signature thereon was his. But later he testified that the writing "looks like mine, but it is too good writing for me." He finally concluded: "I am sure it is not my writing." The letter was then marked for identification and the contents translated. It was addressed to "Mr. and Mrs. Krikor Mikaelian" and opened with the salutation: "Dear Cousin," and closed with: "your cousin Kevork Mikaelian." At this point the trial justice refused to admit the letter as an exhibit since the handwriting had not been satisfactorily identified.

Thereafter respondents presented a handwriting expert who testified that the person who wrote exhibit C for identification was the same person who wrote complainant's exhibit 15-A which was a letter that complainant had written to his fiancee. Thereupon the trial justice allowed the letter to be introduced in evidence as an exhibit. The complainant objected on the ground that this did not sufficiently qualify the expert to compare complainant's hand-

writing, especially since she was unable to say that a sample of complainant's handwriting which he had written at the trial but which the expert had not seen him write, was written by the same person who wrote the letter; and as authority for such objection he relied upon *Kinney* v. *Flynn*, 2 R. I. 319. There is no merit in that contention.

The law, as laid down in that case, governing the introduction of testimony based on comparisons of handwriting to determine identity has long since been substantially modified by statute. See *Municipal Court* v. *Kirby*, 28 R. I. 287. It is now provided by general laws 1938, chapter 538, §14: "Comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine shall be permitted to be made by witnesses; and such writings, and the evidence of witnesses respecting the same, may be submitted to the court and jury as evidence of the genuineness, or otherwise, of the writing in dispute." We think the procedure that was followed in the instant case met the requirements of that statute and that the trial justice did not err in admitting the letter as an exhibit. All of complainant's reasons of appeal argued under his first contention are therefore without merit.

The complainant's second contention raises a question of the sufficiency of the evidence to support the trial justice's decision on the merits. He contends that the evidence does not sustain his findings of fact. In considering this contention it must be borne in mind that complainant had the burden of proving the allegation in his bill of complaint that he was the son of Mariam Mikaelian, deceased, and therefore entitled to obtain partition of her real estate. Having failed to discharge that burden to the satisfaction of the trial justice, he now has the added burden on appeal to this court to show us that the trial justice was clearly wrong. *Di Libero* v. *Tagliaferri*, 76 R. I. 302.

After carefully considering the transcript and the numerous exhibits in the case, we are of the opinion that he

has failed to discharge that burden. On the contrary it appears to us that the trial justice's decision and his findings of fact on which it is based are clearly correct. We were not impressed with the testimony of the complainant or with any of his witnesses on the principal issue, that is, whether he was in fact the son of Mariam Mikaelian. Nor were we inclined to attribute any probative force to the exhibits which he presented in evidence. On the other hand the respondents, although they were under no obligation to do so, appeared to have proved that Krikor and Mariam had no son before coming to America and that the only son born to them here died in infancy. Their evidence also tended strongly to show that the complainant was probably a cousin of Krikor. Some of the respondents' exhibits also tended to lend substantial support to the testimony of their witnesses. In any event it is sufficient to say that the evidence does not, in our opinion, show that the trial justice was clearly wrong either in his findings of fact or the decision based thereon.

The complainant's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

FLYNN, C. J., did not participate in the decision.

*Haig Barsamian, Aram A. Arabian,* for complainant.

*Edward F. McElroy,* for respondents.